UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| | : | |
| PHILIP JAY BERG, | : | Bankruptcy No. 05-39380DWS |
| | : | |
| Debtor. | : | |

# MEMORANDUM OPINION

**BY: DIANE WEISS SIGMUND, United States Bankruptcy Judge**

Before the Court is the Final Application of Fox Rothschild LLP ("Fox") as Attorneys for Terry P. Dershaw, Chapter 7 Trustee, for Compensation and Reimbursement of Expenses (the "Application"). Pursuant to 11 U.S.C. §§ 330 and 331 and Federal Rule of Bankruptcy Procedure 2016, Fox seeks compensation in the amount of $142,426.40 for 374.4 hours of service and reimbursement of expenses of $982.40 for the period October 10, 2006 through April 14, 2008.[1] An objection to the Application (the "Objection") was filed by the debtor Philip J. Berg, and an evidentiary hearing was held on July 8, 2008.[2] For the reasons that

---

[1] There are no objections to the expenses for which reimbursement is sought.

[2] At the initial hearing on the Application held on June 17, 2008, I directed Fox to supplement its Application to provide a itemization of its services by category and attorney in compliance with Local Bankruptcy Rule 2016-2 so as to facilitate its review by the Court and parties in interest. I also directed the Debtor to supplement his general objection to put Fox and the Court on notice of the specific services for which he believes the requested compensation is excessive. Both have done so.

follow, the Objection is granted in part. Compensation in the amount of $126,055.90 and reimbursement of expenses in the amount of $982.40 are allowed.

**BACKGROUND**

A.

On October 10, 2006 Terry Dershaw ("Dershaw" or the "Trustee") was appointed Chapter 7 trustee of the estate of Philip J. Berg ("Debtor") following a contested conversion from a case under Chapter 11.[3] Fox was appointed Trustee's counsel on October 12, 2006. Debtor's Schedules evidence real property valued at $3,200,000, consisting of a commercial property located on Ridge Pike, Lafayette Hills, PA (the "Ridge Property") valued at $2,000,000; Debtor's residence at Pear Tree Lane, Lafayette Hills, PA (the "Residence") valued at $700,000 and Debtor's shore property located at Swarthmore Lane, Ventnor, New Jersey ("Shore House") valued at $600,000. (The Ridge Property, the Residence and the Shore House are collectively referred to as the "Properties."). Doc. No. 16, Schedule A. As of the Filing Date, the Debtor acknowledged secured debts of approximately $480,000 against the Properties and other priority and unsecured claims totaling approximately $142,000. Id., Summary of Schedules . The Trustee's efforts were primarily directed to the

---

[3] I shall take judicial notice of the docket entries in this case. Fed.R.Evid. 201, incorporated in these proceedings by Fed.R.Bankr.P. 9017. See Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1200 n.3 (3d Cir. 1991).

The Chapter 11 proceeding itself was a conversion from a Chapter 13 case which had been filed on November 29, 2005 ("Filing Date") without regard to jurisdictional limits. This history, while irrelevant to the fees requested, nonetheless, illustrates the mind set of the Debtor and his counsel in utilizing the bankruptcy forum and suggests the reason for the high cost of the proceedings.

-2-

sale of the Ridge Property which Debtor vigorously opposed in an attempt to retain it for himself.

Ultimately the Ridge Property was sold, and it has been believed that the Trustee generated sufficient proceeds to pay taxes, the mortgage, costs of administration and claims of unsecured creditors in full plus interest.[4]  Indeed because of the value of the Properties, this has always been viewed as a 100% payment case.  The question has been whether it would be necessary to sell more than the Ridge Property to provide the maximum compensation to creditors before releasing the remaining assets to Debtor.

B.

Section 330(a) authorizes reasonable compensation to a professional employed under § 327, as was Fox, for actual, necessary services, and sets forth  factors the court should consider in making the reasonableness determination. The Objection focuses on two of those factors:  (1) the hourly rates charged by each of Fox's professionals, § 330(a)(3)(B); and (2) whether certain work performed was "necessary to the administration of, or beneficial at the time at which the service was rendered toward completion" of the case.  § 330(a)(3)(C).[5]

Hourly Rates.  Debtor objects to any professional receiving hourly rates of more than $300 in this case; and urges a ceiling of $200 for associates, $150 for paralegals and the rate

---

[4] I was advised at the hearing that a late filed claim has been asserted in the amount of $80,000. See p.15 and n.12 infra.

[5] Based on Debtor's suggested hourly rates and deductions for work he viewed was not of benefit to the estate, he contends that a maximum of $85,445 should be awarded.  He also argues that this amount is "quite sufficient in light of the fact that Debtor's counsel, who represented the Debtor in all phases of this case, from January 2, 2006, to date, requested a total compensation and costs of $22,659.14."  What Debtor's counsel requested for his services to Debtor, services that are not the same as Fox's services to the Trustee, is simply not dispositive of the issue before me.

-3-

of $250 for Prince Thomas, Esquire who is senior counsel to Fox. Fox has identified its attorneys and paralegals in this case and their billing rates as follows:

| Name | Admitted | Hourly Billing Rate |
|---|---|---|
| Edward J. DiDonato, Esq. | 1978 | $435.00* $395.00 |
| Owen A. Knopping, Esq. | 1974 | $450.00 |
| Prince Altee Thomas, Esq. | 1976 | $330.00* $300.00 |
| Samuel H. Israel, Esq. | 1989 | $425.00* $385.00 |
| Daniel K. Astin, Esq. | 2001 | $435.00 |
| Joshua T. Klein, Esq. | 2002 | $255.00 |
| Carrie B. Nase, Esq. | 2004 | $215.00 |
| Joseph G. DiSatanislao (Paralegal) | n/a | $195.00* $175.00 |
| Elizabeth Hunt (Legal Assistant) | n/a | $ 85.00 |

*billing rate as of 6/1/07

In support of its rates, Fox elicited testimony of Fox's partner in charge of the engagement, Edward DiDonato, Esquire ("DiDonato") and its bankruptcy litigation partner Samuel Israel, Esquire ("Israel") who stated that the rates represent the normal, customary rates of the firm charged to its clients for non-bankruptcy matters. They are reviewed annually by Fox's Executive Committee and adjusted commensurate with the prevailing market. Both stated, without any specific comparatives, that the firm's rates were equal to that of Blank Rome and other firms of comparable size, function and stature.

Indeed Israel, who has been with the firm since 1991 (as opposed to DiDonato's more recent tenure), opined that Fox's rates were lower.

To refute this testimony, Debtor testified regarding his rates and his counsel David A. Scholl, Esquire ("Scholl") did the same. Debtor, admitted to the bar in 1971, was until recently a personal injury lawyer whose compensation was (and to a large degree still is) based on a contingent fee arrangement. With the change in the negligence law, he shifted his practice to primarily criminal and domestic relations work and charges $300 per hour. He does not represent trustees in bankruptcy cases and is not sure that he has ever handled a chapter 7 case. His few bankruptcy cases are not recent and arose under chapter 13. His prior work as a salaried assistant state attorney general from 1972-1980 in which he represented the state collecting delinquent taxes has, like his other experience, no relevance to the question of the appropriate billing rate for representing a trustee in an asset Chapter 7 case. While Scholl's experience is certainly more relevant and although his background supports his ability to perform such work, he too never represented a trustee in an asset Chapter 7 case. While he has set $300 as the maximum hourly rate he charges, how that rate has been determined was not explained. However, I note that he has a firm of two lawyers located in suburban Philadelphia, and the resources he brings to a case are quite different than those of a regional multi-practice firm such as Fox. Moreover, Debtor's hourly rate objection appears to be premised in large part on his counsel's conclusion that this is a consumer case and as such, the rates of the consumer bar are relevant. I respectfully disagree. The generally routine and short-lived services required of an attorney representing consumer debtors in Chapter 7 and 13 cases are dissimilar in complexity and intensity to the

services provided by counsel to a trustee liquidating an estate for the benefit of creditors.[6]

Unnecessary Services.  Rather than articulate the basis for objecting to any of the work performed, Debtor's counsel marked up the Application noting time entries that he believed should be disallowed.  Upon examination, they appeared to relate to certain distinct issues which I identified, and the Debtor agreed that they were the essential challenges to Fox's compensation.[7]  They follow below along with the testimony provided by DiDonato and Israel in response to Debtor's contention that the work in these areas conferred no benefit on the estate:

(1) *Investigation of IOLTA account*.  DiDonato testified that the Trustee requested him to verify that the the IOLTA account in which Debtor held client trust funds did not contain any non-client funds.  Debtor did not articulate a basis of objection to this work.

(2) *Any services related to the liquidation of the Shore House and Residence*. DiDonato testified that the Trustee took steps in furtherance of the liquidation of all the Properties because he was never sure that the proceeds generated from a sale of the Ridge Property would be sufficient to pay creditors in full with the interest to which they would be entitled given the equity in this estate.  Thus, his counsel was requested to secure listing agreements, prepare and litigate applications to appoint realtors and take other

---

[6] This is evidenced by the practice adopted by most consumer debtor attorneys of accepting a flat fee in lieu of filing a long form fee application which itemizes by date and time the work performed.  Local B.R. 2016-2.

[7] Debtor's counsel indicated that there might be line items challenged that did not fall under these topics but they were *de minimus*.  As he did not undertake a line by line analysis, I will not do so either. However, I will note that I reviewed each of the highlighted entries and agree that they were relatively insignificant in amount and would not generate more than a couple of hundred dollars of disallowances for issues not discussed below.

-6-

steps preparatory to sale of the other properties. These services were halted when the Ridge Property auction appeared to generate sufficient proceeds to obviate the need for further liquidation of assets. The Trustee now advises that a $80,000 late filed claim, if allowed, may require continuation of the liquidation of one or more of these assets.

(3) *Defense of motions for relief from stay regarding the Shore House and Residence*. Because the Trustee could not conclude that the Shore House would not have to be liquidated as stated above, he actively defended a motion for relief by the mortgagee, U.S. Bank, achieving a settlement that postponed foreclosure. These actions protected the Properties which had potential equity.

(4) *Services provided by Israel*. Debtor did not articulate the basis of his objection to the work performed by Israel, and indeed did not object to all of it. Israel testified that he was called in to provide litigation services when a contested matter required evidentiary hearings. Initially he appeared in connection with a motion for a temporary restraining order Debtor filed in the district court seeking to enjoin the Trustee from proceeding with his motion to sell the Ridge Property. When the TRO was not granted, Israel then acted as litigation counsel in this Court in connection with the motion to approve the sale. Israel also was involved in the defense of a claim filed by Advanced Concepts (see ¶ 7 infra) for an administrative expense and the defense and then settlement of a motion for relief from stay filed by Commerce Bank, the mortgagee of the Ridge Property.

(5) *Services provided by Daniel Astin, Esquire ("Astin")*. DiDonato testified that he was unavailable on the day of the auction sale of the Ridge Property as was the other

Fox bankruptcy lawyer in Philadelphia capable to handle the matter. He then turned to Astin, a resident partner in Fox's Wilmington office, to represent the Trustee at the auction. Debtor did not articulate why he objected to Astin's time.

(6) *Objection to the Claim of the Carpenters' Funds of Philadelphia and Vicinity (the "Funds")*. The Funds had filed a $48,225.93 secured claim consisting of a pre-petition judgment entered by the district court in its favor against Debtor in the amount of $10,668.78 plus post-judgment interest and attorneys' fees and costs. The judgment is on appeal to the circuit court. Trustee's counsel believed that the Funds were not entitled to such a large award of attorneys' fees and objected to the Funds' proof of claim. DiDonato stated that he advised the Trustee that, as a fiduciary, it was his responsibility to contest the seemingly excessive claim for two reasons: (1) he still was not sure that creditors would get all their interest if he did not; and (2) he was concerned that Debtor and his counsel would claim that the trustee breached his fiduciary duty for his failure to do so. He negotiated a settlement with the Funds whereby the claim was reduced by $10,000, and sought court approval pursuant to Fed.R. Bankr.P. 9019. Debtor objected, and while I did not find his reasons persuasive, I nonetheless did not approve the settlement. I found that the Trustee had failed to consider whether the bankruptcy court could even allow fees incurred in an appeal given Fed.R.App. 38 and if I could, whether he had examined the Funds' counsels' billing records to determine whether the fees they claimed were recoverable. Notably until the settlement was reached Debtor took no steps to object to the claim. Since he was the ultimate beneficiary of any reduction, I ordered him to join the claim objection, and he did so,

ultimately reaching a resolution of the Objection with the Funds which allowed the Trustee to turn over the full amount claimed and defer to the Debtor to litigate with the Funds in the appellate court over the amount of attorneys' fees to be granted. Debtor now objects to all the time expended by DiDonato and Thomas, who DiDonato asked to handle the court proceedings, as conferring no benefit on the estate.

Notably while these are the only areas identified by Debtor in his Supplemental Objection, it is the Court's duty under In re Busy Beaver Building Centers, Inc., 19 F.3d 833 (3d Cir. 1994), to perform its independent review of the Application for reasonableness. I have done so and although not challenged by Debtor, I have reviewed the following area of work for its benefit to the estate:

(7) *Litigation with Advanced Concepts, Inc. ("AC")*. AC filed a claim for an administrative expense pursuant to § 503(b)(1)(A) in the amount of $8,286.44 representing its due diligence and attorneys' fees incurred in connection with its unsuccessful bid to buy the Ridge Property. AC averred that it believed that it had an unconditional contract to buy the property, and it was not advised that court approval would be required. In finding that the Trustee's failure to advise AC of the necessity of court approval was a material misrepresentation that AC relied upon in incurring certain of the expenses, I concluded AC was entitled to an administration expense claim of $3,454.94. While I had encouraged the parties to amicably resolve the matter, no settlement was reported and I released my opinion. However, unbeknown to me, the Trustee and AC settled the matter for $7,000. A motion for reconsideration was filed, and I approved the higher expense claim to which the Trustee felt bound.

**DISCUSSION**

In <u>In re Busy Beaver Building Centers, Inc</u>, 19 F.3d 833 (3d Cir. 1994), the Third Circuit Court of Appeals provided the guidance to bankruptcy courts exercising their power under § 330 to determine the reasonableness of professional and other compensation in bankruptcy cases. I had occasion in <u>In re Jefsaba</u>, 172 B.R. 786 (Bankr. E.D. Pa. 1994), to apply the <u>Busy Beaver</u> principles to the very issues before me today. My conclusions and reasoning in <u>Jefsaba</u> have informed my adjudication of fee applications for 14 years and will do so again in this case.

## A. Hourly Rates.

While Debtor seeks to impose a $300 hourly cap on allowable fees in this case, I have long rejected a <u>per se</u> rule that establishes an inflexible ceiling on hourly rates. Rather I have employed a two-step process to determine whether the requested fees are reasonable.

> First, the Court must consider the experience and skill of the professionals in the case. Having done so, the Court must then ask whether the requested fees comport with the market cost for a professional with such experience and skills.

<u>Id.</u> at 796. This market-driven approach allows compensation for services "if and only if analogous non-bankruptcy clients agree to pay for the same, and then only at that rate." <u>Busy Beaver</u>, 19 F.3d at 852. The record is clear that the rates charged by Fox's professionals are the rates charged Fox's non-bankruptcy clients.

Generally so long as the rates being charged are the applicant's normal billing rates, they are afforded a presumption of reasonableness. <u>Jefsaba</u>, 172 B.R. at 799. However, it is still incumbent on the court to examine the requested rates, considering the experience,

knowledge, ability and reputation of the applicant to make sure that they are not out of line with comparable rates in the market, and upon noting a questionable charge requiring the applicant to prove that the market would recompense at that rate. Id.

Regrettably neither of the parties provided much guidance to the court on this issue. Fox's evidence consisted of opinions of its attorneys that its rates were in line or less than comparable firms. No specifics were provided. Debtor's evidence to the contrary was also without real probative effect. As noted, Debtor's rates as criminal and domestic relations lawyer are not relevant. While Mr. Scholl for his own business reasons has determined not to charge more than $300 per hour to his private clients in Chapter 11 cases, there is no evidence that this is the market rate for representing Chapter 7 trustees in asset cases. However, as I noted in Jefsaba,

> The Court of Appeals provided guidance to us in noting that the starting point of our analysis of an appropriate market rate is our "experience with fee petitions" and our "expert judgment pertaining to appropriate billing practices, founded on an understanding of the legal profession."

Id. at 799 (*quoting* Busy Beaver, 19 F.3d at 854). One resource that the judge has in making rate determinations is his or her knowledge of the hourly rates charged by other professionals seeking fee awards in our court. Id.

Reviewing the rates charged by the lawyers and paralegals at Fox against recently filed fee applications by counsel for Chapter 7 trustees in this district convinced me that the Fox rates were consistent with rates charged by firms doing the same work with

-11-

minor exceptions.[8] While DiDonato and Israel were charging in excess of $400 at the end of the period, their blended rates were substantially less as most of their work was done at the pre-June 2007 rate. Mr. Knopping's rate of $450 is reasonable given his special expertise in tax law and years of experience. However, I find that the $175-$195 hourly paralegal rate exceeded the market which ranged from $90-$130. Nothing in the tasks performed by paralegal Joseph DiStanislao warranted the additional charge. A reduction of $645.50 will be made.[9]

In addition to assessing whether the rate is appropriate based on the professionals' skills and experience, the Court must also scrutinize whether the appropriate professional or paraprofessional has been assigned the work performed based on the nature, extent and complexity of the task at hand. I find two instances where the charge for certain tasks appears to exceed a reasonable rate. As the attorney in charge of the engagement, DiDonato, who was admitted to the bar in 1978 and was the principal interface with the client, determined what tasks needed to be performed and had overall responsibility for the filings of pleadings and court proceedings. DiDonato's hourly rate for most of the period for which compensation is sought was $395/hour. His rate, and the rate of all Fox billing personnel, increased on July 1, 2007 to $435/hour. I find that these rates are reasonable for

---

[8] The comparative applicants were Obermayer Rebmann Maxwell & Hippel, LLP (Computer Personalities Systems, Inc., 01-14231), Dilworth Paxson LLP (Reading Broadcasting, Inc., 05-26563), Rawle & Henderson (Piccoli, 05-35170), Adelman & Lavine, Gold & Levin (Lipoff's Wholesale Meats, Inc., 02-10954),Wolf Block (Women's Medical Hospital, 05-15521).

[9] 6.8 hours @ $130 (versus $195) + 3.7 @ $120 (versus $175).

an attorney of DiDonato's experience, skill and responsibility. However, DiDonato rarely delegates the preparation of routine pleadings, research and court filings, tasks that could easily be performed by an associate. Absent justifying circumstances, a reduction in the rate is warranted. DiDonato explains that Dershaw, for whom he acts as counsel in many trustee matters, prefers him to handle the work and that both believe that DiDonato can handle the task more efficiently than an associate with less experience. While it is true that delegation is not always efficient, I find that the absence of delegation on this file imposed an added cost to the estate that must be adjusted. A deduction of $1,740 will be made.[10]

Likewise I find that the cost to the estate of the substitution of Astin, a Wilmington partner admitted to the bar in 2001, for DiDonato imposed an added cost to the estate, both in the two hour travel time charged for commuting from Wilmington to Philadelphia and the higher hourly fee for an attorney of less experience. Astin's hourly rate of $435 exceeded that of DiDonato's at $395 and that of Israel, admitted to the bar in 1989, at $385.[11] I find it inappropriate to charge the estate for the travel time, and I will reduce Astin's rate to $395, the rate DiDonato would have charged, making a deduction of $1,095 to the fees requested.

---

[10] I identified 11.6 hours of work that should have been delegated. Using the $255 hourly rate of bankruptcy associate Joshua Klein, I have deducted $150/hour from the charges for this work. Recognizing that it would be inefficient to delegate small tasks, I have not reduced DiDonato's higher rate when the time entry is less than .4 unless it was part of a larger project.

[11] DiDonato speculated that Astin's rate reflected the Wilmington market for large Chapter 11 work. Israel believed the firm did not have a separate rate structure for that office. In any event, handling a real estate auction, albeit with its share of issues, does not present the level of complexity of the Chapter 11 work prevalent in Delaware.

-13-

B.  Benefit to the Estate.

As noted, the disagreement with Fox's services is grounded in Debtor's view that they did not produce a demonstrable benefit to the estate and thus were not necessary, an express requirement for their compensation.  11 U.S.C. § 330(a)(3)(C).  Turning once again to Jefsaba, I have concluded that:

> so long as there was a reasonable chance of success which outweighed the cost in pursuing the action, the fees relating thereto are compensable.  Moreover, professionals must often perform significant work in making the determination whether a particular course of action could be successful.  Such services are also compensable so long as, at the outset, it was not clear that success was remote.

172 B.R. at 800.  I shall apply that cost/benefit analysis to the areas of work challenged by Debtor.

(1) *Investigation of IOLTA account*.  This service, requested by the Trustee to discharge his fiduciary duty to investigate the Debtor's assets, is clearly compensable. Debtor has not indicated why it is questioned and thus full payment will be allowed.

(2) *Any services related to the liquidation of the Shore House and Residence*. The Debtor objects to compensation for counsel's efforts in taking the legal steps preparatory to a liquidation of these two properties contending that the work was unnecessary since the sale of the Ridge Property alone was sufficient to pay creditors in full.  As noted above, the test of what is necessary cannot be applied in hindsight.  If at the time the work is performed, it reasonably appears that it would benefit the estate, it may be compensated. DiDonato testified that he was requested to list these other properties to ensure a full

-14-

payment case when it was not clear what proceeds would be generated by the sale of the Ridge Property. I take judicial notice of many hearings at which I asked that question of the Trustee's counsel and was advised that given the unresolved tax liabilities it was premature to state that all creditors would be paid in full with interest from the liquidation of the Ridge Property. Indeed, it is still not clear that additional funds will not have to be generated to pay creditors in full with interest given the *pro se* motion of Eric Bradway ("Bradway") to file a claim out of time.[12] I also find that once the Ridge Property was sold, the Trustee did not proceed with his efforts to sell the other properties and has used considerable restraint to the benefit of the Debtor who continues the use and enjoyment of these other properties. I find that Fox is entitled to compensation for this work.

(3) *Defense of motions for relief from stay regarding the Shore House and Residence*. Debtor's objection to the steps Fox took to protect the Residence and Shore House from foreclosure by objecting to motions for relief from stay fails for the same reason as stated above. The services benefitted the estate by preserving the assets for potential liquidation. More to the point, it clearly also benefitted the Debtor whose actions in failing to pay his mortgages put the properties at risk. In negotiating a resolution that prevented stay relief, Fox provided a valuable service to the Debtor for which he should be grateful.

(4) *Services provided by Israel*. Again Debtor did not explain why he objected to certain of Israel's services but I am satisfied that they provided value to the estate commensurate with the time and at the rate charged. Israel is a bankruptcy litigator whose

---

[12] Bradway contends that he never received notice of the bankruptcy so as to allow him to file a timely claim. Debtor has objected but the Trustee has yet to file an objection although he states that he intends to do so.

-15-

services were necessary given the contentious issues in this case. By way of an example, rather than present an objection to a sale of the Ridge Property at a regularly scheduled hearing before this Court, Debtor filed a temporary restraining order against the Trustee and me to stop the sale hearing. The Trustee had to defend that frivolous action in the district court, and called on his litigator Israel to handle the matter. Debtor was warned that his litigious posture was going to end up costing him in the end but would not restrain himself in his determined efforts to obstruct the sale. Moreover because of the Debtor's approach, the Trustee was required to make an even more careful record at the actual sale hearing which occurred in this court. The preparation for and appearance at these hearings constituted a large part of Israels' time. The other matters that Israel was called upon to handle also involved contested matters for which deposition or trial testimony was anticipated (e.g., defense of Commerce Bank motion for relief). Other than the time spent in connection with the Advanced Concepts litigation which I discuss below, I will allow Israel's time in full.

(5) *Services provided by Daniel Astin, Esquire ("Astin")*. Debtor did not articulate the basis of his objection to Astin's services. I have already considered his hourly rate and made a deduction so that the estate would not be paying more for his participation than it would have for that of DiDonato who would have handled the matter but for his unavailability. I find no further deduction is warranted.

(6) *Objection to the Claim of the Carpenters' Funds of Philadelphia and Vicinity (the "Funds")*. The initial evaluation of the Funds' claim and discussion with the Trustee

about the course of action to be taken was conducted by DiDonato.[13] While Debtor objects to this time, I respectfully disagree. The Trustee does have a duty to examine all claims and object where appropriate. The Funds' claim was a large one and somewhat suspect given the disparity between the judgment amount and the fees claimed for collecting it. Moreover, in filing the Objection, which Debtor failed to do, the Trustee's actions contributed to the settlement that the Debtor was able to reach.[14] DiDonato's evaluation and lodging of the objection are compensable under § 362(d)(3)(D). However, it is where the matter was turned over to Thomas that I find the Debtor to be on more solid ground.

Thomas' activities included preparing for and attending the initial claim objection hearing. As representative of the party with the initial burden, I found him to be unprepared to make a record and unable to explain to me why the estate was taking the laboring oar on a matter that appeared at that point to be for the benefit of the Debtor who had not objected to the claim. He stated that the facts were agreed, and I ordered a stipulation to be filed with accompanying briefs since the basis of the Trustee's position was unclear. The hearing was unproductive. The documents were filed but a settlement was reached before the matter was decided. He handled that aspect of the case, reporting to DiDonato who interfaced with the Trustee. As noted, I refused to approve the settlement, finding that Thomas did not

---

[13] To the extent that his evaluation required legal research and concluded with the filing of pleadings, I have already reduced his hourly rate for this work.

[14] In bringing the issue to the Court, albeit with an unsuccessful result, the Trustee's settlement brought the Debtor into the matter when I directed him to join in or supplement the pending objection.

consider applicable law nor adequately review the basis of the claim. While aware at this point that the principal beneficiary of any reduction in the claim was the Debtor, he never involved the Debtor in the settlement discussions. Had Thomas done his homework, he would have foreseen the Debtor's objection and the flaw in the settlement. His efforts provided little benefit and much cost to the estate. Thomas has billed almost $10,000 for his work on the Funds' Objection. Of the 29.8 hours billed, Debtor objects to all but 2.2 hours. I will sustain that part of the objection and deduct $9,090 from the fees allowed.[15]

(7) *Litigation with Advanced Concepts, Inc. ("AC")*. Fox seeks approximately $3,800 for its handling of the litigation and settlement of the AC claim[16] which was filed in the amount of $8,626.10, allowed at $3,454.94 and settled without knowledge of the adjudication, for $7,000. It is hard to see how this effort made any contribution to the estate on any basis. First without regard to the fact that the claim arose because of the Trustee's oversight (see above), the expenditure of an additional $1,270 to reduce a claim by $1,626.10 makes little sense. At that juncture and after the expenditure of $2,500 on litigation, it is hard to understand why Fox did not await the decision which would have saved the estate $3,500. The incurring of costs for a reconsideration motion because of its failure to advise the court of the settlement is especially unwarranted. In short, the cost to the estate of $10,800 ($7,000 settlement plus $3,800 Fox fees) exceeds the claim of $8,626.10 and shows poor

---

[15] 27.0 hours @ $330 plus .6 @ $300.

[16] Fox did not separately categorize this time. My review reflected approximately $2,500 for litigating the claim and $1,270 for settling it (including the motion for reconsideration which increased the court award from $3,454.94 to $7,000, consistent with the settlement).

billing judgment. I am not unmindful that Fox did the work described and performed a service to the Trustee whose failure to include the court approval condition in the AC contract resulted in this litigation. DiDonato has informed the court of his close working relationship with Dershaw and may have felt particularly committed to defend the AC claim. In such case, it may be appropriate for Dershaw, not the estate, to compensate Fox for its efforts on his behalf. However, I shall make a deduction of $3,800 from the requested compensation.

**CONCLUSION**

Based on the foregoing, I shall allow Fox compensation of $126,055.90 and expense reimbursement of $982.40 which the Trustee is authorized to pay forthwith. An Order consistent with this Memorandum Opinion shall be issued.[17]

_____
DIANE WEISS SIGMUND
United States Bankruptcy Judge

Dated: July 21, 2008

---

[17] $142,426.40 requested less $16,370.50.